UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| JOHN L. SHALLENBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:15-cv-00001-SLC |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, *sued as Carolyn W.* | ) | |
| *Colvin, Acting Commissioner of* | ) | |
| *Social Security,* | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff John L. Shallenberger appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's

decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Shallenberger applied for DIB and SSI in April 2011, alleging disability as of December

31, 2006, which he later amended to December 31, 2009. (DE 12 Administrative Record ("AR")

24, 134-46, 154). Shallenberger was last insured for DIB on December 31, 2009 (AR 68), and

thus, with respect to his DIB claim, he must establish that he was disabled as of that date. *See*

*Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that with respect to a DIB

claim, a claimant must establish that he was disabled as of his date last insured in order to

---

[1] All parties have consented to the Magistrate Judge. (DE 17); *see* 28 U.S.C. § 636(c).

recover DIB).

The Commissioner denied Shallenberger's application initially and upon reconsideration. (AR 71-78, 81-87). After a timely request, a hearing was held on December 17, 2012, before Administrative Law Judge Yvonne K. Stam ("the ALJ"), at which Shallenberger, who was represented by counsel, and a vocational expert, Sharon Ringenberg (the "VE"), testified. (AR 40-66). On April 4, 2013, the ALJ rendered an unfavorable decision to Shallenberger, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of sedentary jobs in the economy. (AR 22-33). The Appeals Council denied Shallenberger's request for review (AR 5-8), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Shallenberger filed a complaint with this Court on January 2, 2015, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Shallenberger argues that: (1) the ALJ improperly discounted the credibility of his symptom testimony; (2) the ALJ assigned a residual functional capacity ("RFC") that was not supported by substantial evidence; and (3) the VE's testimony upon which the ALJ relied at step five lacked a proper foundation. (DE 18 at 12-18).

## II. FACTUAL BACKGROUND[2]

At the time of the ALJ's decision, Shallenberger was 49 years old (AR 134); had obtained his GED and specialized training in carpentry (AR 168); and had worked as a carpenter from 1996 to December 31, 2006 (AR 168).

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 884-page administrative record necessary to the decision.

## A. Shallenberger's Testimony at the Hearing

At the hearing on December 7, 2012, Shallenberger testified that he was living with his girlfriend and her two sons, ages 10 and 23. (AR 45). In a typical day, he gets up early, reads, takes his dog out, goes for a short walk, and then reads or watches television the rest of the day. (AR 55). He does some household chores such as washing dishes, but he does not vacuum due to cramping in his legs. (AR 53-54). He lies down intermittently throughout the day due to leg cramps and to reduce the swelling in his legs. (AR 62).

Shallenberger testified that he has light seizures twice a week that last five to 10 minutes, after which he is "fine," although he has a headache for an hour or two afterward. (AR 51-53). He more rarely—about once a month—has a seizure where he wakes up on the floor; his recovery time after a "lay down" seizure is 25 minutes to an hour. (AR 51). He was taking 1,000 mg of Keppra twice daily for his seizure problem at the time of the hearing, which he had been on "for quite a while"; he had initially been on a lower dosage of Keppra, but he was still having seizures, so they increased his dosage. (AR 52). Sometimes his medications make him feel nauseous. (AR 56). Shallenberger stated that in 2009 he had difficulty obtaining his medications because he could not afford them, so he started going to the Matthew 25 Clinic, a free or low-cost clinic. (AR 49). The Matthew 25 Clinic has tried to get him in to see a neurologist, but the neurologist does not work through the Clinic. (AR 53). Shallenberger lost his driver's license in late 2009 after he was arrested for operating a vehicle while intoxicated. (AR 48). He testified that when he was eligible to get his license back after taking classes subsequent to his arrest, his doctor asked him to not do so because of his seizures. (AR 48).

Shallenberger testified that he also has problems with swelling in his hands and legs,

3

which can cause him difficulty moving his fingers and ankles. (AR 57). He takes Lasix and several other medications to reduce the tightness, which help, but also cause frequent urination; he wears a compression stocking on his left leg. (AR 57-58). The swelling in his legs increases with sitting, so he lies down and elevates his legs above his head for 20 minutes, five times a day. (AR 58-59). Shallenberger estimated that he could sit for 20 minutes before needing to get up, stand for 10 minutes before needing to sit down, and walk about a quarter of a mile. (AR 54). He estimated that he could lift up to 15 pounds. (AR 54).

Shallenberger uses several inhalers to help his breathing. (AR 60). Smoke, perfume, and hot weather all bother his breathing, and he commented that his girlfriend's son smokes in the house. (AR 60-61). He takes a nitroglycerin tablet once every few days when he experiences angina; the nitroglycerin gives him a headache lasting up to 20 minutes. (AR 61).

### B. Contacts by Social Security on May 9, 2011, and June 10, 2011

On May 9, 2011, Shallenberger told the Social Security representative that he was having three or four seizures a week, each lasting three to four minutes. (AR 179). He was no longer seeing a neurologist for his seizures or going to the hospital after a seizure due to his financial limitations. (AR 179). He was taking 750 mg of Keppra twice daily at the time. (AR 179). He could not afford the cost of 1,000 mg of Keppra twice daily, so his dosage had been reduced to 750 mg twice daily, which is less expensive. (AR 179). He stated that he no longer drives, but he was recently cleared by a doctor to drive. (AR 179).

Shallenberger's girlfriend's son then talked with the representative. (AR 179). He reported that Shallenberger was indeed driving at the time and that he had no problems doing so. (AR 179). He stated that Shallenberger's seizures were occurring once a week, but that he had

two or three in the same day. (AR 179). During a seizure, Shallenberger will sit unresponsive for three or four minutes, but he does not convulse or become incontinent. (AR 179). The seizures almost always occur at night between 8:00 p.m. and 10:00 p.m.; he is usually tired afterwards, so he sits on the couch for 30 minutes before resuming activity. (AR 179).

On June 10, 2011, the Social Security representative spoke with Shallenberger's girlfriend. (AR 180). She reported that three or four months earlier, Shallenberger was having seizures just once a month, but they had since increased to about three to four times a month. (AR 180). Each seizure lasts about 10 minutes, with Shallenberger staring blankly; he does not convulse. (AR 180). He is confused after a seizure and requires 30 minutes to two hours to recover. (AR 180).

### C. Summary of the Relevant Medical Evidence Prior to December 31, 2009, the Last Date Shallenberger Was Insured for DIB

In 2005, Shallenberger was hospitalized after experiencing chest pain and some intermittent nausea. (AR 211). The physician noted his history of coronary disease, that he had bypass surgery and mitral valve replacement in 1998, that he had an implantable defibrillator, and that he smoked cigarettes for 30 years and continued to do so. (AR 211). Upon discharge, Shallenberger's diagnoses included chest pain, unstable angina; coronary artery disease with ischemic cardiomyopathy, stent placement, and angioplasty; cardiomyopathy with ejection fraction of 30 percent; mitral valve replacement; implantable cardiac defibrillator; history of cerebrovascular accident; hypertension; COPD; and tobacco dependence. (AR 213).

On July 1, 2006, Shallenberger was hospitalized for chest pain. (AR 274-93). A cardiac catheterization revealed that only one of his bypass grafts was patent; the native coronary arteries had total occlusion of the distal left anterior descending, distal circumflex and proximal

right coronary artery. (AR 274). He was instructed to continue medical therapy with adjustments to his medications. (AR 274-75). His discharge diagnoses included recurrent angina pectoris, multi-vessel coronary disease, ischemic cardiomyopathy, mitral valve prosthesis, status post implantable cardioverter-defibrillator implant, hyperlipidemia, hypertension, chronic tobacco abuse, and chronic anti-coagulation therapy for mechanical mitral valve prosthesis. (AR 274).

On February 21, 2007, Shallenberger was hospitalized with signs of left arm cellulitis after being bitten by a cat. (AR 589-91). He experienced some difficulty with speech while there, and a head CT scan revealed an abnormal appearance with the left temporal lobe, which appeared to be vascular in origin. (AR 590-91). His difficulty with speech, however, completely resolved prior to discharge. (AR 351). Discharge diagnoses included cellulitis, embolic cerebrovascular accident, mitral valve replacement with inadequate anticoagulation, cat bite, and hematoma formation requiring repeat incision and drainage. (AR 351).

On February 2, 2008, Shallenberger went to the emergency room for palpitations of his chest and a transient loss of speech. (AR 436). He was diagnosed with a transient ischemic attack. (AR 436). He then underwent implantable cardioverter-defibrillator replacement. (AR 453).

On April 28, 2009, Shallenberger was hospitalized after experiencing seizure-like activity at home and a fall. (AR 580-81). He appeared lethargic with post-seizure confusion. (AR 580). A CT scan of the head revealed foci of old infarct involving the lateral left temporal lobe, but no evidence of acute process. (AR 580-81, 584).

A year later, on April 19, 2010, Shallenberger was seen by Casey Kroh, M.D., for follow

up of hypertension, hyperlipidemia, bypass grafting in 2003, defibrillator placement, and valve

replacement. (AR 672). He had run out of Keppra. (AR 672). Dr. Kroh discussed with

Shallenberger getting his driver's license back, stating that he needed to go to a state license

branch to get that completed. (AR 672). On November 24, 2010, Shallenberger returned to Dr.

Kroh, reporting angina and that his right hand was numb and cold; Dr. Kroh reviewed his current

medications. (AR 669).

On February 21, 2011, Shallenberger presented to the emergency room with complaints

of left thigh pain and difficulty walking. (AR 595-96). He had open wounds from recent flea

bites and scratching; the rash pattern was consistent with cellulitis of the thigh. (AR 595-96).

He was started on intravenous antibiotics and hospitalized. (AR 596, 639-40). His discharge

diagnoses included extensive cellulitis of the left thigh; acute kidney injury, prerenal; left ankle

ulceration; flea bites; history of mitral valve replacement; coronary artery disease; hypertension;

anemia; hyperglycemia; and arthritis. (AR 639).

On March 2, 2011, Shallenberger was seen for follow up by Leslie Swartz-Williams,

M.D., his primary care physician, after his hospitalization for cellulitis. (AR 664-66). He

continued to have severe pain, tenderness, warmth, and drainage in his left leg, but he stated that

his symptoms were improving. (AR 664). He also reported fatigue, joint stiffness, lethargy,

malaise, and swollen glands. (AR 664). He had 3+ pitting edema of his left knee. (AR 665).

Additionally, his left elbow was red and swollen. (AR 665). His current treatment included

antibiotics as well as elevation and irrigation of his left leg. (AR 664). Dr. Swartz-Williams's

assessment included cellulitis of the leg and olecranon bursitis.  (AR 665).  Shallenberger

returned to Dr. Swartz-Williams several times in March 2011, and he received a left elbow

injection for his bursitis due to continued elbow erythema and tenderness.  (AR 662-63).

On May 19, 2011, Shallenberger complained to Dr. Swartz-Williams of chest pain and

seizures.  (AR 747).  Dr. Swartz-Williams indicated that Shallenberger's seizures had been fairly

well controlled over the long term, but that recently they had increased in frequency and had

become poorly controlled.  (AR 747).  Shallenberger reported that the seizures were occurring

nine times a week and included loss of consciousness.  (AR 747).  Dr. Swartz-Williams

increased his Keppra dosage from 750 mg twice daily to 1,000 twice daily.  (AR 738).  As to his

chest pain, Shallenberger reported that he had been stable with his coronary artery disease

symptoms, but that recently he had been experiencing intermittent chest pain at rest; he also

complained of intermittent episodes of moderate epigastric abdominal pain, which worsened

with eating.  (AR 747).  He had no limb pain, swelling, edema, or difficulty walking, but

reported intermittent mild dizziness when getting up quickly.  (AR 747-48).  He was assessed

with chest pain, hypertension, seizure disorder, coronary artery disease, nicotine dependence,

and abdominal pain and tenderness.  (AR 749).  Dr. Swartz-Williams opined that due to his

coronary artery disease and multiple other co-morbidities, Shallenberger was at high risk of a

myocardial infarction and other serious complications, especially under the conditions of

uncontrolled seizures.  (AR 749).  A CT scan revealed a remote infarction on the left likely

involving the distribution of the left posterior cerebral artery, but no definite acute process.  (AR

745).

Shallenberger returned to Dr. Swartz-Williams one week later, on May 26, 2011, for

follow up of his seizure disorder. (AR 738). Dr. Swartz-Williams assessed that Shallenberger's seizures had been fairly well controlled over the long term and that management changes had been made at his last visit, including increasing his dosage of Keppra. (AR 738). She indicated that Shallenberger's seizures had since been decreasing in frequency and severity, indicating that he had "fair symptom control." (AR 738). Dr. Swartz-Williams noted that Shallenberger was able to perform his activities of daily living without limitations. (AR 738).

On June 7, 2011, H.M. Bacchus, Jr., M.D., examined Shallenberger at the request of the state agency. (AR 757-58). He reported having eight petit mal seizures in the past two weeks and that he had experienced a seizure five days earlier, followed by fatigue and a headache. (AR 757). He told Dr. Bacchus that he could sit for 20 minutes, stand for five minutes, walk one minute, and carry five pounds. (AR 757). Upon exam, Shallenberger was able to get on and off the exam table without difficulty. (AR 758). His gait was antalgic favoring the left leg, but steady and sustainable; he was able to walk on heels, toes, and tandem walk. (AR 758). His muscle strength and tone were 3/5 in the right upper extremity, 4/5 in the left upper extremity, and 5/5 in the lower extremities bilaterally; he had range of motion deficits throughout. (AR 758). His fine and gross dexterity and his sensation were preserved. (AR 758). He had no edema, ulcerations, or lesions in his extremities. (AR 758). Dr. Bacchus's impression was seizures, uncontrolled but treated; stroke, status post double bypass, mitral valve replacement, and defibrillator; and heart failure, treated with surgeries. (AR 758). Dr. Bacchus opined that Shallenberger "appear[ed] to be unable to work at this time due to his heart condition and seizures." (AR 758).

On June 23, 2011, Shallenberger's labwork revealed that his Keppra drug level was

below the therapeutic range.  (AR 780).

On July 1, 2011, Shallenberger became a new patient at the Matthew 25 Clinic.  (AR 788-93).  The Clinic indicated that Shallenberger's seizure disorder was "well controlled" by Keppra at a dosage of 1,000 mg twice daily.  (AR 789).

On July 12, 2011, Shallenberger went to the emergency room for an 20-minute episode where he felt a buzzing on the front of his face, had a metallic taste in his mouth, and could not say his significant other's name; he remained conscious and there was no seizure-like activity. (AR 808).  The doctor thought he had a likely partial and mild recurrent seizure; the doctor noted that Shallenberger was on a "good dose of Keppra" and did not recommend any immediate changes, instructing him to follow up with his neurologist regarding any potential changes with Keppra.  (AR 808-10).

On August 2, 2011, the Matthew 25 Clinic indicated that Shallenberger's seizure disorder was stable, without report of recent seizures.  (AR 821).  He had +2 pitting edema of his left leg and was instructed to elevate both legs when sitting.  (AR 820-21).  On September 6, 2011, the Matthew 25 Clinic documented that Shallenberger had a mild seizure 10 days earlier.  (AR 835). Pitting edema was observed in both legs, and he was instructed to elevate his legs when sitting. (AR 835).

On August 12, 2011, Mangily Hasanadka, M.D., a state agency physician, reviewed Shallenberger's record and opined that he could lift 10 pounds frequently; stand or walk two hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to extreme temperatures, wetness, fumes,

odors, dusts, gases and hazards.  (AR 824-31).  In arriving at these limitations, Dr. Hasanadka gave Dr. Bacchus's opinion minimal weight, finding that it was based on Shallenberger's subjective report of limitations, rather than objective examination findings and medical evidence.  (AR 830).  Dr. Hasanadka also considered that Shallenberger's seizures had historically been well controlled and that his lab work in June 2011 revealed that his Keppra drug level was below the therapeutic range.  (AR 826).  On October 26, 2011, M. Brill, M.D., another state agency physician, reviewed the record and affirmed Dr. Hasanadka's opinion.  (AR 847).

On October 5, 2011, Shallenberger presented to the Matthew 25 Clinic with a headache, shortness of breath, and cough.  (AR 840-41).  He was assessed with uncontrolled hypertension.  (AR 841).  He was transported to the emergency room, and his blood pressure was stabilized; he was then released.  (AR 872).  On December 6, 2011, Shallenberger returned to the Matthew 25 Clinic for a check up; his blood pressure was 160/100, and his medications were adjusted.  (AR 858-59).  The assessment noted that Shallenberger's seizure disorder was controlled with Keppra.  (AR 859).

Shallenberger visited the Matthew 25 Clinic several times in 2012 for follow-up appointments and to have his Coumadin level checked.  (AR 848-67).  On March 14, 2012, the Matthew 25 Clinic indicated that he had no significant angina and his blood pressure was better.  (AR 855).  While the Clinic noted that he had a history of pitting edema of his legs, no current issues with edema were noted.  (AR 855, 857).  On May 11, 2012, the Clinic indicated that his asthma and COPD were stable, but he reported having seizures one week earlier.  (AR 853).  He was instructed to continue taking Keppra and to refrain from driving.  (AR 853).  He had no current issues with edema.  (AR 852).  On September 7, 2012, Shallenberger had run out of

Keppra, he did not complete his labs, and neurology would not see him because he owed them money; his asthma and COPD were noted to be stable.  (AR 848-49).  The Matthew 25 Clinic discussed with him the importance of completing his lab work prior to appointments and staying on his medications.  (AR 849).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted).  "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits."  *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

# IV. ANALYSIS

## A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On April 4, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 22-33). The ALJ noted at step one of the five-step analysis that Shallenberger had not engaged in substantial gainful activity since his alleged onset date. (AR 24). At step two, the ALJ found that Shallenberger had the following severe impairments: coronary artery disease on Coumadin status post St. Jude valve replacement and status post defibrillator placement; a seizure disorder treated with Keppra; a history of 2008 transient ischemic attacks; chronic obstructive pulmonary disorder ("COPD"); and obesity. (AR 24).

At step three, the ALJ concluded that Shallenberger did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 26). Before proceeding to step four, the ALJ determined that Shallenberger's symptom testimony was not credible to the extent it was inconsistent with the following RFC:

> [T]he claimant has the [RFC] to perform work at less than the full range of the sedentary exertional level . . . and can lift, carry, push and pull ten pounds occasionally and frequently; in an eight-hour work day can sit for about six hours and can stand and walk in combination for at least two hours; can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to . . . hazards including unprotected heights and unguarded machinery; must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and must avoid concentrated exposure to hazards including unprotected heights and unguarded machinery.

(AR 27).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Shallenberger could not perform any of his past relevant work. (AR 31). At step five, however,

14

the ALJ found that Shallenberger could perform a significant number of unskilled, sedentary jobs in the economy, including charge account clerk, telephone order clerk, and addresser. (AR 32). Therefore, Shallenberger's applications for DIB and SSI were denied. (AR 32-33).

### C. The ALJ's Credibility Determination Will Not Be Disturbed

Shallenberger first argues that the ALJ erred by finding that his statements concerning the intensity, persistence, and disabling effects of his seizures were not entirely consistent with, or supported by, the medical and other evidence. (AR 28). For the following reasons, the ALJ's credibility determination will not be disturbed.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"). "[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) (citations omitted).

Shallenberger challenges the ALJ's assessment that his seizure problem "ha[s] generally

been stable on medication." (AR 29). Shallenberger argues that such a statement is insufficient, as an impairment "can be 'stable' and 'disabling' at the same time." (DE 18 at 12); *see Barnes v. Colvin*, 80 F. Supp. 3d 881, 889 (N.D. Ill. 2015) ("'Stable' only signifies that Barnes' condition remained the same over a period of time. It does not address the level of what his condition was. Plaintiff could have been 'stable' and non-functional, or 'stable' and fully functional.'").

But here, the ALJ also considered Dr. Swartz-Williams's statement that Shallenberger's seizures had been "fairly well controlled" over the long term, and that when they did briefly increase in severity and frequency in May 2011, an increase in his Keppra dosage decreased his seizures in frequency and severity within one week. (AR 29). The ALJ also considered that while Shallenberger reported some seizures in 2012, in most instances he had been without Keppra at the time. (AR 29). As such, the ALJ declined to adopt Shallenberger's assertion that his seizure disorder was disabling, and instead accounted for his seizures in the RFC by precluding him from climbing ladders, ropes, or scaffolds and from exposure to hazards such as unprotected heights and unguarded machinery. (AR 27).

The ALJ's assessment of the evidence concerning Shallenberger's seizures is not an unfair characterization of the record. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("The ALJ must evaluate the record fairly."). The first evidence of seizure-like activity in the record was in April 2009 (AR 580-81), and by April 2010, Dr. Kroh talked of Shallenberger getting his license back (AR 672), which suggests that his seizures were adequately controlled when his DIB eligibility expired on December 31, 2009. *See Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998) (explaining that with respect to DIB, the claimant must provide evidence that she was actually disabled before her date last insured, not just that she was diagnosed with a

condition expected to last for a continuous period of 12 months). The next medical evidence of record concerning Shallenberger's seizures is not until mid-May 2011.

As explained above, in May 2011, Dr. Swartz-Williams indicated that Shallenberger's seizures had been "fairly well controlled" over the long term, and his recent increase in seizures responded quickly to a higher dosage of Keppra, despite the fact that his lab work the following month revealed a Keppra drug level below the therapeutic range.[4] (AR 738, 747). Although the record reflects a report of some seizure activity in 2012 (AR 808-10), the Matthew 25 Clinic consistently characterized Shallenberger's seizures as "well controlled," "controlled," or "stable" on a Keppra dosage of 1,000 mg twice daily. (AR 789, 821, 859). The record reveals, however, that when Shallenberger appeared for appointments in 2012, more often than not he had failed to complete his lab work prior to the appointment and he had run out of Keppra. (*See, e.g.*, AR 848, 858). The Clinic counseled him to complete his lab work prior to appointments and to take Keppra as prescribed. (AR 849, 853). The ALJ also considered that Shallenberger did not visit the emergency room in 2012 for any seizure-related issues. (AR 29).

Shallenberger argues that the ALJ improperly discredited his symptom testimony about his seizures based on his failure to seek regular medical treatment without first considering his financial limitations. Indeed, an ALJ must "not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek

---

[4] As a general matter, before a claimant can meet Listing 11.02 or 11.03 for epilepsy, the claimant must demonstrate, among other things, that he has therapeutic blood drug levels of anti-convulsant medication. SSR 87-6, 1987 WL 109184, at *2-3 (Jan. 1, 1987) ("The predominant reason for low anti-convulsant blood levels is that the individual is not taking the drugs as prescribed.").

medical treatment." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996)[5]; *see also Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). But here, the ALJ was well aware of Shallenberger's limited financial resources, as the ALJ specifically stated in her decision that Shallenberger "started going to Matthew 25 because he was having trouble affording his medications." (AR 28). Once he became a patient at the Matthew 25 Clinic in July 2011, there is no evidence that Shallenberger was still unable to afford the higher dosage of Keppra (1,000 mg twice daily) that best controlled his seizures. In fact, at the hearing in December 2012, Shallenberger testified that he was taking 1,000 mg of Keppra twice daily at the time and that he had been "for quite a while." (AR 52). Therefore, the ALJ did not run afoul of Social Security Ruling 96-7p, as her decision reveals that she took into account Shallenberger's financial limitations.

Next, Shallenberger argues that the ALJ improperly discounted the credibility of his symptom testimony based on the evidence concerning his driving. Shallenberger argues that he was forthright in telling the ALJ that he lost his license in 2009 due to driving while intoxicated, not because of seizures. (AR 48). Shallenberger emphasizes that it was not until later—after he was eligible to get his driver's license back after completing classes subsequent to his arrest—that the doctor told him not to drive due to seizures. (AR 48). In that regard, although the ALJ noted that Dr. Kroh had cleared Shallenberger to drive in April 2010 (AR 29), the ALJ failed to mention that the Matthew 25 Clinic in May 2012 told him not to drive because he had experienced seizures a week earlier. (AR 853). Thus, the ALJ's consideration of the evidence pertaining to Shallenberger's driving was imperfect in this respect.

---

[5] Although Social Security Ruling 96-7p was superseded by Social Security Ruling 16-3p in March 2016, *see* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), Social Security Ruling 96-7p governed at the time the ALJ issued her decision and the parties refer to Social Security Ruling 96-7p in their briefs. Accordingly, the Court will refer to SSR 96-7p herein.

Nevertheless, this oversight does not make the ALJ's credibility determination "patently wrong." *Powers*, 207 F.3d at 435. Shallenberger does not dispute that he told the Social Security representative on May 9, 2011, that he no longer drives, while his girlfriend's son reported just the opposite—that Shallenberger was driving at the time and had no problems doing so. (AR 178). The ALJ was entitled to consider this inconsistent reporting of information as a factor that undercuts Shallenberger's credibility. *See* SSR 96-7p, 1996 WL 374186, at *5-6 (July 2, 1996).

That Shallenberger was driving is also relevant to his activities of daily living. The ALJ is entitled to consider a claimant's daily activities as a factor when assessing the credibility of his subjective complaints. *See Schmidt v. Astrue*, 395 F.3d 737, 746-47 (7th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). In this regard, the ALJ assessed that Shallenberger had only mild limitations in his daily activities. (AR 25). The ALJ also considered Dr. Swartz-Williams's statement on May 26, 2011, that Shallenberger was "able to do activities of daily living *without limitations*." (AR 738 (emphasis added)). Shallenberger does not challenge the ALJ's consideration of this evidence.

"[A]n ALJ's credibility assessment will stand 'as long as [there is] some support in the record.'" *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). Here, the ALJ's credibility determination with respect to Shallenberger's seizures, while not perfect, is sufficiently supported by the medical evidence of record, his mild limitations in activities of daily living, and the inconsistencies of record concerning his driving. In sum, the ALJ built an adequate and logical bridge between the evidence of record, *see Ribaudo*, 458 F.3d at 584, and her conclusion about

the credibility of Shallenberger's symptom testimony is not "patently wrong," *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

### D. The RFC Assigned by the ALJ Is Supported by Substantial Evidence

Next Shallenberger argues that the RFC assigned by the ALJ is not supported by substantial evidence, in that the ALJ failed to account for his problems with cellulitis and also improperly discounted the opinion of Dr. Bacchus concerning his seizures. Neither of Shallenberger's arguments warrant a remand of the Commissioner's final decision.

Although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. §§ 404.1545(e), 416.945(e); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment."). The RFC is a determination of the tasks a claimant can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC assessment:

> is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545, 416.945. Thus, a medical source opinion concerning a claimant's work ability is not determinative of the RFC assigned by the ALJ. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." (citing 20 C.F.R. § 404.1527(d)); *see* SSR 96-5p, 1996 WL 374183, at *5

(July 2, 1996).

With respect to Shallenberger's cellulitis, the ALJ reviewed the evidence pertaining to this condition, noting that Shallenberger had been hospitalized in February 2011 due to cellulitis of his left thigh. (AR 25). The ALJ further considered that three months later, in May 2011, Dr. Swartz-Williams observed that Shallenberger had no difficulty walking and no limb pain or swelling. (AR 25 (citing AR 747-48)). The ALJ further considered that while Dr. Bacchus documented "cellulitis" in his consulting exam in June 2011, he observed no edema, ulcerations or lesions. (AR 25 (citing AR 758)). In fact, at that consulting exam, Shallenberger could walk on heels, toes, and tandem walk; and his gait, though antalgic and favoring his left leg, was steady and sustainable. (AR 25 (citing AR 758)). In light of this evidence, the ALJ's step-two conclusion that "the claimant's cellulitis was not a durationally severe impairment" is adequately supported. (AR 25).

Shallenberger disagrees. He points out that he had issues with cellulitis of his left arm back in February 2007 and that cellulitis of his leg was included on his list of "active problems" in May 2011 by Dr. Swart-Williams. (AR 738, 748). He further emphasizes that he testified at the hearing about his continued problems with leg edema. (AR 57-59).

But the ALJ's conclusion that Shallenberger's 2011 bout with cellulitis did not meet the durational requirement is adequately supported by the record. To reiterate, "[t]he claimant must show that [he] is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a *continuous* period of not less than 12 months." *Estok*, 152 F.3d at 638 (emphasis added) (citing 42 U.S.C. § 423(d)(1)(A)). There is absolutely no medical evidence to support Shallenberger's assertion that his cellulitis lasted or was expected to last for 12 months. In 2007, he developed a

bout of cellulitis in his left arm after he was bitten by a cat. (AR 355). Four years later, in 2011, he developed a bout of cellulitis in his left leg from flea bites associated with household dogs. (AR 595). Contrary to Shallenberger's assertion, there is no medical evidence of record that indicates cellulitis was a continuous problem from 2007 through 2011. Nor does the evidence show that the cellulitis he developed in February 2011 lasted longer than just a few months. And although Shallenberger had some pitting edema in his legs in August and September 2011 (AR 820-21, 835), by March and May 2012, the physical exams did not indicate observations of current edema (AR 852, 855). Consequently, Shallenberger's challenge to the RFC based on his cellulitis does not require a remand of the Commissioner's decision.

Shallenberger's second challenge to the RFC is that the ALJ should have assigned more weight to the opinion of Dr. Bacchus, a consulting examiner, than the opinions of the state agency physicians. To review, Dr. Bacchus concluded in June 2011 that Shallenberger "appears to be unable to work at this time due to his heart condition and seizures." (AR 758). After penning an entire paragraph on Dr. Bacchus's opinion, the ALJ ultimately gave it "limited weight." (AR 30). The ALJ gave several reasons for doing so, including that: (1) the opinion appeared largely based on Shallenberger's subjective report of symptoms, rather than objective findings and medical evidence; (2) two weeks after the examination, Shallenberger's lab work revealed that his Keppra drug levels were below the therapeutic range, and subsequent medical records indicate that his seizure issues were generally stable except when he had run out of Keppra; (3) Dr. Bacchus's examination occurred prior to Shallenberger being diagnosed with COPD, which subsequent medical records indicated was controlled with medication; (4) Shallenberger's seizures had been well controlled over the long term and more recent notes from Dr. Swartz-Williams indicated that his seizures were improving; and (5) there was nothing in Dr.

Bacchus's objective findings that was inconsistent with an ability to perform a limited range of sedentary work.  (AR 30).

"The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(d)(3); 416.927(d)(3); *see Smith v. Apfel*, 231 F.3d 433, 441 (7th Cir. 2000) ("[T]he absence of laboratory findings from [the treating physician's] report is a factor that the ALJ could consider in determining the weight to give [his] opinion." (citations omitted)). "[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (citation omitted); *see Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) ("ALJs may discount medical opinions based solely on the patient's subjective complaints."); *see also Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Here, Dr. Bacchus failed to support his opinion with citations to objective medical signs or laboratory findings that relate to Shallenberger's seizure and cardiac conditions.  Nor does Shallenberger suggest how the limitations in range of motion and strength that Dr. Bacchus documented support an assertion of disability based on his seizure and cardiac conditions.  As the ALJ emphasized, there is no indication that the documented range of motion and strength deficits contradict the RFC assigned by the ALJ limiting Shallenberger to sedentary work that requires lifting, pushing, and pulling no more than 10 pounds.  (AR 30).  And although Shallenberger claims he has limitations in manipulating items due to hand numbness, Dr. Bacchus found that his sensation and fine and gross dexterity were intact.  (AR 758).

As such, the ALJ did not err in assigning Dr. Bacchus's opinion less weight and choosing

to assign more weight to the opinion of the state agency physicians, who found that Shallenberger could perform a limited range of sedentary work. The regulations, and this Circuit, clearly recognize that reviewing physicians are experts in their field and the ALJ is entitled to rely on their expertise. *See* 20 C.F.R. § 404.1527(f)(2)(i), 416.927(f)(2)(i) ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."); *see also Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990). It is the responsibility of the ALJ, not the court, to resolve conflicts in the medical evidence. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We . . . are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). Here the ALJ sufficiently did so.

In sum, Shallenberger's two challenges to the RFC—that the ALJ failed to account for his cellulitis in the RFC and that the ALJ assigned too little weight to Dr. Bacchus's opinion—do not merit a remand of the Commissioner's final decision. The RFC, which is a finding reserved to the Commissioner, is supported by substantial evidence.

### E. Shallenberger Forfeited His Step-Five Argument by Failing to Raise It at the Hearing

Shallenberger's final argument is that the VE's testimony concerning the number of jobs he could perform lacked an adequate foundation. Shallenberger cites *Hermann v. Colvin*, in which Judge Posner commented that the Dictionary of Occupational Titles was an obsolete and unreliable source regarding the number of available jobs. 772 F.3d 1110, 1113 (7th Cir. 2014). Shallenberger argues that here the VE "merely rattled off testimony about the number of jobs supposedly in the economy that the plaintiff could perform without any explanation of how she set on those numbers." (DE 18 at 18 (quoting *Grant v. Colvin*, 4:13-cv-00204-RLY-TAB, 2015

WL 410488, at *6 (S.D. Ind. Jan. 29, 2015))).

Shallenberger, however, did not question the VE's foundation at the hearing. (DE 63-66). As a result, he has forfeited this argument. *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) ("[B]ecause [the claimant's] lawyer did not question the basis for the vocational expert's testimony, purely conclusional though that testimony was, any objection to it was forfeited." (citations omitted)). "An ALJ's reliance on imperfect VE testimony does not warrant remand if . . . a claimant does not question the basis for the testimony at the time of the hearing." *Meyerink v. Colvin*, No. 2:13-CV-327-PRC, 2015 WL 773041, at *14 (N.D. Ind. Feb. 24, 2015) (collecting cases); *see Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) ("[A]n ALJ is entitled to rely on unchallenged VE testimony." (citations omitted)). As such, Shallenberger's final argument requires no further attention. The Commissioner's decision will be affirmed.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Shallenberger.

SO ORDERED.

Entered this 23rd day of September 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge